UNITED STATES

v.

Sergeant Michael C. WESTON, FR 553–86–7282 United States Air Force Postal and Courier Service Operating Location 3AI United States Air Forces in Europe.

ACM 21910.

U. S. Air Force Court of Military Review.

Sentence Adjudged 30 April 1975.

Decided 11 Feb. 1976.

790

Appearances: Appellate counsel for the Accused: Colonel Jerry E. Conner and Major John A. Cutts, III. Appellate counsel for the United States: Colonel Julius C. Ullerich, Jr., Captain Alvin E. Schlechter and Captain Frederick P. Waite.

## DECISION

ORSER, Judge:

Tried by a general court-martial consisting of a military judge sitting alone, the accused was convicted, despite his not guilty pleas, of six specifications of wrongfully opening mail in the base postal mailroom before receipt by the addressees, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The approved sentence provides for a bad conduct

discharge, confinement at hard labor for seven months and reduction to the grade of airman basic.

Appellate defense counsel, in addition to inviting our attention to an assertion of error submitted on behalf of the accused in his request for appellate representation, have filed a brief in support thereof, and have independently assigned one other error for our consideration. We need not consider the latter assignment, for we find merit necessitating remedial action in counsel's first assertion which contends, in essence, that the accused's confession was improperly admitted in evidence as it was the product of prior illegally obtained admissions.

Factually, on 17 October 1974, three undelivered, but opened, letters were discovered in a mail cart at the Spangdahlem Air Base, Germany, post office. The incident was duly investigated by agents of the Air Force Office of Special Investigations (OSI). The accused, one of the postal workers, was in due course identified as a suspect, and on 5 November 1974, properly advised of his Article 31, Miranda-Tempia [1] rights by an OSI agent named Thompson. Thompson specifically advised the accused he was suspected of stealing mail from the post office on or about 16 October 1974. The record does not reflect that the accused was interrogated at that time, or what, if any, statement he may have made.

On 24 November 1974, Technical Sergeant Billington, the acting postal chief, and superior of the accused, was made aware that some 140 to 150 additional opened pieces of mail had been found in the post office latrine. The next morning, at approximately 0805 hours, as Sergeant Billington was parking his auto in the post office parking area, the accused appeared and in a rather agitated manner indicated he had to talk. Sergeant Billington asked why, and the accused replied he had attempted to kill himself the night before by ingesting pills and turpentine. Sergeant Billington testified that in response to that revelation he "might have asked [the accused] . . . if it was the bulk mail, the mail that they found."

Sergeant Billington admitted that when he asked the question about the mail he was aware the accused was being investigated by the OSI for the offenses, and that he himself considered the accused to be one of the possible suspects. The accused's declaration that he had attempted suicide caused Sergeant Billington to conclude he was guilty. He testified his question was motivated by his curiosity about the accused's guilt and his need to report the matter to his superior officer. Whatever the accused may have responded is not reported in the record of trial, for the military judge sustained defense counsel's objection thereto, ruling as a matter of law that the circumstances called for an Article 31 warning.

Following the parking area discussion, Sergeant Billington accompanied the accused to the base hospital. About an hour and a half later, around 0930 hours, the two returned to the post office. On the way, Sergeant Billington talked with the accused, but did not recall what he said. At the post office, Billington read the accused his Article 31 rights from a copy of the 1951 Manual for Courts-Martial, and informed him he was suspected of taking the mail that had been discovered. There is no indication the sergeant advised the accused of his right to counsel. Sergeant Billington testified that after the accused acknowledged he understood his rights, he asked him if he had taken the mail. The accused replied in the affirmative. Sergeant Billington further related that though the accused was not under apprehension during this session, he would not permit him to leave his presence. Specifically, he thought he had told him "not to go anywhere, to stay with me." He did this, he said, since he was not certain the accused "would change his mind and take off and go somewhere or what." Sergeant Billington further explained that his superior officer had told him he was not to permit the accused into the postal facility.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v.* *Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

At approximately 1000 hours that same day, Agent Slade of the OSI entered the post office for the purpose of interviewing personnel other than the accused in connection with the mail theft investigation, and Sergeant Billington advised him of what had transpired. About five minutes thereafter, the accused, who was cognizant of the fact that Sergeant Billington had just conversed with Slade, was subjected to interrogation by the agent. The record reflects that Agent Slade properly advised the accused of his Article 31 and counsel rights. At the conclusion thereof, the accused waived his rights and submitted to interrogation. The accused, who in Slade's opinion, "was very cooperative and wanted to get it off his chest," then confessed to the offenses for which he was subsequently tried.

During the trial, upon defense objection, the military judge excluded from consideration the admission made by the accused to Sergeant Billington. The subsequent confession to Agent Slade, which had been reduced to writing, was admitted in evidence and considered by the court in spite of defense objection thereto.

In the defense view, the foregoing circumstances demonstrate the admissions by the accused to Sergeant Billington resulted from conduct not in compliance with the law. They urge that the accused's subsequent confession to Agent Slade was " . . . the direct result of exploitation by the Government of its illegal action and, hence, inadmissible." *United States v. Crow*, 19 U.S.C.M.A. 384, 41 C.M.R. 384, 387 (1970). The Government disagrees. They see a break in the chain of circumstances between Sergeant Billington's and Agent Slade's sessions with the accused sufficient to demonstrate that the final statement was not improperly influenced by the preceding events.

■ The evidentiary rule of law germane to our inquiry was succinctly reiterated by the United States Court of Military Appeals in *United States v. Hundley*, 21 U.S.C.M.A. 320, 325, 45 C.M.R. 94, 99 (1972). There, in addressing the question of the admissibility of statements made following tainted admissions, the Court declared:

> If the Government secures admissions without full compliance with the law and the admissions are a kind likely to produce a later confession, convincing evidence must exist that a later warning severed the presumptive influence of the first statement on the later one. *United States v. Bennett*, 7 U.S.C.M.A. 97, 21 C.M.R. 223 (1956).

■ As a necessary prerequisite to consideration of the accused's confession, we initially focus on the accused's confrontations with Sergeant Billington. Though the military judge ruled that any statement the accused may have made during the first such encounter, as well as his subsequent admission some two hours thereafter, were inadmissible, we are not bound by such determination in evaluating whether those events exerted improper influence on the subsequent confession. *United States v. Seay*, 1 M.J. 201 (1975); *United States v. DeLeon*, 5 U.S.C.M.A. 747, 19 C.M.R. 43 (1955). Thus, if from our independent examination we were to conclude the military judge erred in excluding such evidence, there would be no "presumptive influence" to consider in connection with the confession to Agent Slade. Having therefore carefully scrutinized such evidence, we nonetheless find ourselves in complete accord with the trial judge respecting these preliminary events.

■ As to the first encounter, clearly, Sergeant Billington occupied "some position of authority of which the accused was aware" when he asked his question about the stolen mail. *United States v. Dohle*, 1 M.J. 223 (1975). And, without question, the sergeant was acting in an "official capacity" when he asked it. *United States v. Beck*, 15 U.S.C.M.A. 333, 35 C.M.R. 305 (1965); *United States v. Dohle*, supra (concurring opinions of Judges Ferguson and Cook). His question was designed to confirm what he suspected—that the accused was guilty of mishandling the mail. Although such response as the accused may have made to the question is not contained

in the record for our appraisal, if it amounted to an admission of culpability it was inadmissible. In the circumstances, such an admission would not have constituted a spontaneous utterance volunteered by the accused, not requiring an Article 31 warning. See *United States v. Workman,* 15 U.S.C.M.A. 228, 35 C.M.R. 200 (1965); *United States v. Dandaneau,* 5 U.S.C.M.A. 462, 18 C.M.R. 86 (1955). As we read the record, the accused desired to talk about his suicide attempt. We see no basis to infer he was also bent on confessing his guilt. Before asking an accusatory question, Sergeant Billington, who was acting in an official capacity, and who suspected the accused of an offense, was required to warn him pursuant to Article 31. *United States v. Seay,* supra; *United States v. Woods,* 22 U.S.C.M.A. 369, 47 C.M.R. 124 (1973); *United States v. Beck,* supra; *United States v. Harvey,* 21 U.S.C.M.A. 39, 44 C.M.R. 93 (1971).

■ Though, as observed, the accused's response was not permitted to be heard, the fact remains he was queried, without preliminary warning, about the offenses he subsequently admitted committing. In our judgment that factor, though it would not alone give rise to a presumptive taint, nevertheless weighs against the Government in the determination of whether the accused's ultimate confession was voluntary.

Moving on to the accused's second encounter with Sergeant Billington, during which he admitted his guilt, the most significant issue is whether the session amounted to custodial interrogation. As observed, though the accused made his admission to Sergeant Billington after having been advised of his Article 31 rights, he was not similarly notified of his right to counsel pursuant to the mandate of the United States Supreme Court in *Miranda* and the Court of Military Appeals in *Tempia,* and again stressed by the Supreme Court in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

■ As declared by the Court of Military Appeals in *United States v. Jordan,* 20 U.S.C.M.A. 614, 44 C.M.R. 44 (1971):

*Miranda* and *Tempia* are apposite only if [an accused makes] a statement during a custodial interrogation. Such a determination depends not on whether he technically was in custody but on whether he was "otherwise deprived of his freedom of action in any significant way." *Miranda,* supra, at page 444 [86 S.Ct. 1602].

The Court further pointed out that neither the superior status of the interrogator nor the military status of the accused solely determines the matter. In counseling that each case must be examined for the presence of a more significant deprivation of freedom than mere status, the Court stressed, however, that "questioning by a commanding officer or military policeman or investigator at which an accused is provided an Article 31 warning strongly suggests that an accused is also entitled to a right to counsel warning. . . ." *Jordan,* supra, at 47.

Here, though Sergeant Billington was not the accused's commanding officer nor a military policeman, the position he occupied as the accused's superior noncommissioned officer and the senior official at the post office, was certainly of a commensurate level. And, of course, in reading Article 31 to the accused and proceeding to question him, he had taken it upon himself to investigate the matter for the commanding officer who was located at another installation. As in *Jordan,* supra, where the Court found the accused was in a coercive situation for *Miranda* and *Tempia* purposes which required he be informed of his right to counsel, the accused in the case at hand was the prime suspect, if not the only one. He was also read his Article 31 rights, a circumstance, we have seen, which is in itself strongly suggestive that the right to counsel advice is also necessary. Additionally, the accused, though not, in Billington's opinion, under apprehension, had been directed by his interrogator to remain with him lest "he change his mind and take off and go somewhere." Obviously, the accused could not have left Sergeant Billington's "office with impunity until he was

dismissed." *United States v. Jordan*, supra, at 46.

█ It was urged by the Government at trial and reasoned by the staff judge advocate in his review, that the Article 31, *Miranda-Tempia* advice provided the accused on 5 November 1974, retained its vitality at the time he dealt with Sergeant Billington on 25 November. According to the argument, since the accused had been thoroughly advised in an investigation involving a closely related matter, it is reasonable to assume he had not forgotten those rights. And, there was no requirement the warning be repeated, since there was no indication the accused had forgotten or did not understand such rights.

We fail to find this argument persuasive. Granted, the Court of Military Appeals has held that once an appropriate warning has been given, a subsequent failure to repeat it is not necessarily error, *United States v. Schultz*, 19 U.S.C.M.A. 311, 41 C.M.R. 311 (1970); and "separate periods of inquiry can constitute a single continuous interrogation." *United States v. White*, 17 U.S.C. M.A. 211, 38 C.M.R. 9 (1967). We are also cognizant that our predecessor Board of Review found in one case that a proper warning still applied and the accused remained fully aware of his rights 13 days thereafter, and in another case even some 30 days after the warning was provided. *United States v. Paul*, 24 C.M.R. 729 (A.F.B. R.1957); *United States v. Radford*, 17 C.M.R. 595 (A.F.B.R.1954). In those cases, the Board observed that the same subject matter was continuously being investigated, and saw no indication the accused had forgotten or misunderstood his rights.

In all cited cases the interrogations concerned virtually identical subject matter. Moreover, in the Court of Military Appeals decisions, the time interval between interrogation sessions was much less than that we here encounter. In the case before us, the initial interrogation concerned only three *opened* letters found in the post office. However, some three weeks later, when Sergeant Billington inquired about the "bulk mail" and later interrogated the ac-

cused, some 140 to 150 new opened pieces of mail had been discovered. Though admittedly the offenses were connected respecting both subject matter and location, they were at the same time new, separate and distinct. Finally, in our view, the fact that the 25 November sessions were between the accused and his duty superior as contrasted with the earlier instance of advice by an agent of the OSI, in itself is a significant break in what might otherwise be considered a continuous interrogation. On this evidence, we decline to find that the accused remained fully aware of his testimonial and counsel rights when questioned by Sergeant Billington.

█ Based on all these circumstances, we conclude the accused's admission of guilt to Sergeant Billington was made during a custodial interrogation which imposed upon the Government an affirmative responsibility to establish he was informed of his right to counsel. *United States v. Tempia*, supra. Since there is no indication such advice was provided, the ensuing admission was inadmissible in evidence and the military judge's decision to exclude it was proper. *United States v. McCauley*, 17 U.S.C.M.A. 81, 37 C.M.R. 345 (1967); *United States v. Hall*, 23 U.S.C.M.A. 549, 50 C.M.R. 720, 1 M.J. 162 (1975).

Having so decided, we turn to the confession made approximately one half hour after the improperly obtained admission. Pursuant to the teaching of *Bennett* and *Hundley*, both supra, we must look to determine whether the presumptive influence exerted by the admission (which, without question, had a likelihood to induce the confession), as compounded to some degree by the earlier improper questioning, was overcome by the warning administered by Agent Slade.

In the case of *United States v. Seay*, supra, the Court of Military Appeals most recently applied the *Bennett-Hundley* evidentiary standard. In so doing, the Court emphasized that when the Government has improperly secured incriminating statements or other evidence, only the "strongest combination" of attenuating factors

would "be sufficient to overcome the presumptive taint" infecting any subsequent statement. Citing *United States v. Wimberley*, 16 U.S.C.M.A. 3, 36 C.M.R. 159 (1966).

Some of the pertinent factors bearing on the determination of whether the presumptive taint has been eliminated are: the time interval between the interrogation sessions; whether the accused acknowledged his prior admissions exerted no influence on his decision to subsequently confess; whether the confession was obtained by the same interrogator who obtained the prior inadmissible statement; whether the interrogator relied upon the prior admissions in his effort to gain a confession, or conversely, clearly made the accused understand the prior admissions could not be used against him;[2] the accused's mental status and emotional condition; the nature and degree of the improper influence; and of course the thoroughness and correctness of the warning given preceding the confession. *United States v. Seay, United States v. Wimberley, United States v. Bennett, United States v. Monge*, all supra; *United States v. Powell*, 13 U.S. C.M.A. 364, 32 C.M.R. 364 (1962); *United States v. Caliendo*, 13 U.S.C.M.A. 405, 32 C.M.R. 405 (1962); *United States v. Tersiner*, 47 C.M.R. 769 (A.F.C.M.R.1973).

Scrutiny of the evidence surrounding the confession discloses that the primary factor having an arguable tendency to insulate it from the preceding events was that the confession was obtained by Agent Slade of the OSI, whereas the prior questioning was conducted by Sergeant Billington. And, as seen, at the outset of his interrogation Agent Slade correctly and thoroughly advised the accused of his Article 31, *Miranda-Tempia* rights. Significantly diluting such advice, however, was the extreme brevity of the time interval between the improperly obtained admission

and the interrogation that followed. A compounding related factor is that the accused was aware that Sergeant Billington conversed with Agent Slade immediately before the latter's interrogation. It is reasonable to assume the accused was quite aware his freshly provided admission of guilt was the subject of that conversation.

Agent Slade made no effort to insulate his interrogation session from the earlier questioning by Sergeant Billington. The record shows he did not inform the accused his earlier statement could not be used against him. Further, the record quite understandably contains no acknowledgement by the accused, though he may well have been cooperative and desirous of confessing, that his prior admission was not influential in his decision to confess. In light of all these circumstances, we are unconvinced that Agent Slade's warning severed the presumptive influence of the improper admission on the confession. Accordingly, the military judge erred prejudicially in admitting the confession into evidence over defense objection. *United States v. Hall, United States v. Seay*, both supra.

For the reasons stated, the findings of guilty and the sentence are incorrect in law and are set aside. A rehearing may be ordered.

ROBERTS, Senior Judge, and SANDERS, Judge, concur.

---

2. Though certainly an important factor in the overall determination, in fact, the preferable procedure in seeking an additional statement, we note "it is not a precondition to the admission of a properly obtained statement that the accused be informed that a previous statement cannot be used against him." *United States v. Wimberley* and *United States v. Seay*, both supra; see also *United States v. Monge*, 1 U.S. C.M.A. 95, 2 C.M.R. 1 (1952).